# ORPHANS' COURT OF BALTIMORE CITY

Filed May 2, 1892.

MICHAEL H. CATON

VS.

MARY B. McGLELLAN.

*Julius Wyman* and *Ferdinand C. Dugan* attorneys for caveator.

*Francis P. Stevens* attorney for Mrs. McGlellan.

LINDSAY, GANS and EDWARDS, J.J.—

This is a case where a citation was ordered to go out at the instance of Michael H. Caton against Mary B. McGlellan, widow of Henry McGlellan, to show cause why she should not bring the will of the said Henry McGlellan into court.

In answer to this citation, the said Mary B. McGlellan appeared in court in due time, and, by solemn affidavit, declared that no will was left by her husband at his death nor any estate, and that therefore she could not comply with the demand of the citation.

A certain day for the hearing was fixed by the court, at which time the witnesses, pro and con, were examined, after which the respective counsel were heard in their arguments touching the law and the facts in the case.

As to the question lying at the threshhold, did a will of the said Henry McGlellan once exist? The court entertains no doubt whatever. On this point the witnesses (including the widow) are in entire harmony; all asserting with one accord that such a will had been executed by the deceased; and the court is satisfied from the circumstances of the case and persons involved in its formation, that it was executed in due form, according to the requirements of the law, and that it was a good and valid will.

Very different, however, is the testimony of the witnesses as the contents of the will. The plaintiffs swear that the will divided the estate into two parts, one-half to the widow, and the other half to the nephew, the said Michael H. Caton. Mrs. Mary B. McGlellan, the widow, testified, on the other hand, that while the testator lived, it was to be enjoyed by him and his wife in common, and that after his death all of it was to go to her as his widow.

Michael H. Caton, thus claiming the one moiety of the estate, was the grandnephew of the deceased, and as such without a will and in law, not be entitled to any part of the estate, whilst the widow, having no children, would, even without the will, have a clear legal claim to the one-half of it. The evidence, therefore, on which this grandnephew seeks to establish the provision of the will, which he claims to exist in his favor to the extent of one-half of the estate, against one so closely and tenderly allied to the testator in nature and affection as his wife (his other self), to be left alone and helpless in the world at his death, ought to be exceedingly clear—altogether beyond any reasonable doubt. This can hardly be said by any calm person in the ordinary use of his reasoning faculties of the proof given in this case, even after it is admitted that the witnesses so testifying as to the disposition of the estate in this form seem to be competent as to intelligence and earnest as to their testimony. Still, the possibility remains that the contention may be correct.

But, even though the witnesses were all in perfect accord on this point, as they were as to the execution and existence of the will, it still would not

follow that this will, with this disposition of the testator's property, was in existence at his death. This brings us to the next, and perhaps still more vital, point in this case, to wit: Was the will destroyed?

After carefully weighing all the evidence on this point, we feel constrained to say that we have just as little doubt touching the distruction of the will as we had in regard to its execution and correct form. Clearly, it did have an existence at one time, and, in our opinion, it is just as clear that, at another time, it had no existence, namely, at the day of the testator's death. This however, clear as it is, would not in itself be fatal to the claim of the nephew; for if the destruction should have been caused by any one other than himself, and without his direction, or even by himself without a competent mind, it could still be reconstructed on proof of its contents, and be made as vital and effective as when it was first executed, had the death of the testator then occurred.

The next question, then, is, by whom was it destroyed? Outside of circumstantial evidence, this point depends mainly upon two witnesses who saw the destruction—the wife, now widow of the testator, and Sallie Fahey. The testimony of the wife is that near the end of his life he brought the will to her and requested her to take and burn it. She said no, she could not do this, you must do this yourself. Thereupon he took it and with his own hands put it into the stove in her presence and that of the other witness, to whom he said, before doing it, "this is my will," and thus converted what was once a will into ashes. It is also in evidence that he retained his good mind up to the day of his death. There was but one will spoken of throughout the examination of the witnesses, and that was this paper so consumed in the stove, and not any other. A conclusion different from this would, in our opinion, be not only reckless and illogical, but quite destitute of sufficient or adequate reason. Nor was it shown by any of the witnesses that there was any undue influence brought to bear upon his mind, constraining him against his will to do this act.

In view of evidence so direct and positive, and uncontradicted by like counter testimony, we cannot doubt that the testator himself, with competent mind and memory, and with entire freedom, destroyed this will intending so to do.

Prior to doing this, it is in evidence that he had called in Attorney Stevens and directed him to prepare a new paper, possibly, and even probably, in the form of another will, as he had said to Mr. Burns, president of the Eutaw Savings Bank, when, somewhat indignant at his refusal to return to him the will, (in which refusal he may have thought, and probably did, that his nephew had some hand.) "you may keep it, and I will have another by 10 o'clock tonight"; but his attorney, to whom he had intrusted the protection of the rights of his wife, using his own judgment as to the best thing to be done, drew up a deed by which the whole property was given to his wife, to take effect at once, to which, after it was read to him, he assented, saying, "it is all right."

All this, it seems to us, makes it entirely clear that, if in the will he had, as a clearly made-out fact, given only one-half of the property to his wife, and the other half to his nephew, he had subsequently, led perhaps by the graver reflections which his closer proximity to the grave induced, changed his mind as to his duty in this matter to his wife, of whom he said, after it was done. "When I married her my house was empty, but now it is filled with plenty—she is deserving of it all."

As confirmatory still farther of this change of mind, he had, after the deed was executed, given her the whole of his estate, given also to his nephew, wholly unsolicited by him, according to his own testimony, $100, money, too, which belonged not to him, but to his wife by her testimony; and why did he do this, if not because of his change of mind, and in lieu of the legacy which, according to their own theory, he had led him to anticipate?

Now then, in view of the preceding facts, and much else and more that might be added, of the same general nature, we are clearly of the opinion that Henry McGlellan, at the time of his death, left no will, nor yet any property which might become the subject of administration.

Therefore it is hereby ordered and decreed that the citation be, and the same is dismissed with costs.